**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MICHAEL GONZALEZ, JR.,    )    NO. CV 12-10261 SS
                       )
           Plaintiff,     )
                       )
         v.          )
                       )    **MEMORANDUM DECISION AND ORDER**
CAROLYN W. COLVIN,      )
Commissioner of the Social  )
Security Administration,   )
                       )
          Defendant.    )
_____)

**I.**

**INTRODUCTION**

Michael Gonzalez, Jr. ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying him disability benefits.  The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

**II.**

**PROCEDURAL HISTORY**

Plaintiff Michael Gonzalez Jr. filed an application for Title II Disability Insurance Benefits on January 20, 2010. (AR 156-57) Plaintiff alleged a disability onset date of September 1, 2007. (AR 156). The Agency denied Plaintiff's application on May 18, 2010. (AR 96). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on July 15, 2010. (AR 102). Plaintiff testified at a hearing held before ALJ Lawrence D. Wheeler on April 7, 2011. (AR 20-39). On May 25, 2011, the ALJ issued a decision denying benefits. (Id.). Plaintiff then requested review of the ALJ's decision, which the Appeals Council denied on October 12, 2012. (AR 1-6). Plaintiff filed the instant action on December 3, 2012.

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on May 15, 1970. (AR 201). Plaintiff completed twelfth grade and some college and obtained a contractor's license. (AR 184, 309). Plaintiff then worked as a general contractor until 2007. (AR 309). Plaintiff has past relevant work as a general contractor and a foreman. (AR 37-38). From 2007 to 2010, Plaintiff saw a number of doctors for both a left Achilles tendon injury, foot pain and mental health problems. (AR 246-391).

2

**A.   <u>Medical History and Treating Physicians' Opinions</u>**

### 1. Physical Condition

On June 5, 2007, Plaintiff visited the El Segundo Family Medical Group for left foot pain.  (AR 251).  Plaintiff injured his Achilles Tendon in a snowboarding accident in 2006 and had surgery, but alleged "pain for a long time".  (AR 251, 376).

Plaintiff had a podiatry evaluation with Michael Bloch, DPM, on March 4, 2008. (AR 260).  Plaintiff had mild pain on flexion and Achilles sensitivity.  (AR 261).  Plaintiff did not show up to his podiatry appointment with Dr. Bloch on March 25, 2008.  (AR 256).  On April 11, 2008, Plaintiff had foot x-rays taken that showed a tendon spur and a metallic object likely left from a surgery.  (AR 257-58).

Over two years later, Plaintiff visited UCLA Medical Center for an orthopedic evaluation on July 21, 2010.  (AR 337).  Plaintiff noted being "ok - pain-wise." (<u>Id.</u>).  Plaintiff was referred to Gary Briskin, DPM.  (<u>Id.</u>).  On August 9, 2010, Plaintiff again visited UCLA.  (AR 336). Plaintiff said he had been bike riding for exercise and mentioned that he had scheduled an upcoming surgery with Dr. Briskin.  (<u>Id.</u>).

On August 20, 2010, Plaintiff saw Dr. Gary Briskin for Achilles tendon surgery and removal of spurring.  (AR 386).  Dr. Briskin said the surgery had "excellent results".  (AR 378).  On September 21, 2010, Plaintiff was reported as having excellent strength.  (AR 382)  On October 26, 2010, Dr. Briskin reported that Plaintiff's level of walking

had increased significantly since the surgery.  (AR 380).  Plaintiff was also referred to physical therapy.  (AR 376).  Over the course of six weeks, Plaintiff's weight bearing improved and he went from wearing a boot as needed for walking to wearing normal shoe gear, although he reported pain.  (AR 374-77).  On November 30, 2010, Plaintiff was ordered to be "more aggressive with stretching" and to use foot orthotics for stabilization. (AR 379).  Plaintiff's last visit with Dr. Briskin was December 28, 2010.  (AR 378).  Plaintiff reported pain in the Achilles area, but there was no fluid.  (Id.).  Plaintiff was assessed with inflammation.  (Id.).

In February 2011, Plaintiff reported to his psychiatrist that he had "mixed feelings re:attempting to work with Dad part-time." (AR 355). Plaintiff was bike riding and reported that his foot was feeling better. (AR 355).  Plaintiff still complained of pain but only took over the counter medication for relief.  (Id.).  In March of 2011, Plaintiff reported that he was bike riding a few times a week depending on the weather.  (AR 354).

## 2.  Mental Condition

On June 6, 2007, Plaintiff had a consultation with Elva Ruth Mezquita, M.D. and was approved for twenty treatment sessions.  (AR 269).  Dr. Mezquita initially diagnosed Plaintiff with dissociative disorder, but she later changed her diagnosis to paranoid state.  (AR 365-66).  On October 23 2007, Dr. Mezquita noted that Plaintiff smelled of alcohol on exam.  (AR 364).  Plaintiff had not been taking his medication for six weeks and was drinking "heavily."  (Id.).  Plaintiff

4

alleged hearing "a lot of noise" in his head and said he had become suspicious of his wife and kids. (Id.). Plaintiff also admitted to drinking at night, for help sleeping. (Id.). Plaintiff then quit therapy and did not return for over a year. (Id.). On August 22, 2008, Plaintiff returned to visit Dr. Mezquita. (AR 364). Plaintiff did not explain why he stopped seeing her for mental evaluations. (Id.). Plaintiff claimed to be anxious and obsessive. (Id.).

On December 21, 2009, Plaintiff visited Gelbart and Associates Psychological Services for a psychiatric consultation. (AR 280-283). Plaintiff alleged depression, panic attack, "trust issues," paranoia, auditory hallucinations, suicidal thoughts and insomnia. (Id.). Plaintiff stated that he sometimes drank two beers at a time and he smoked marijuana from "time to time." (Id.). Plaintiff admitted that three years previously he was an alcoholic. (Id.). Plaintiff also stated that he had a job, "but [could not] leave the house." (Id.). On exam he was appropriately dressed and groomed, able to maintain eye contact and could relate well. (Id.) Plaintiff was also described as depressed, anxious and having limited insight. (Id.). The diagnosis was psychosis and Plaintiff was given medication. (Id.).

Plaintiff returned in January 2010 for further psychiatric treatment. (AR 283). Plaintiff continued to report paranoia and the inability to leave the house, but stated that his medications were helping. (Id.) Plaintiff also admitted to a history of cocaine, mushrooms and alcohol, but denied any current abuse. (Id.). The diagnosis was polysubstance abuse. (Id.).

On March 19, 2010, Plaintiff went to the Lake Arrowhead Treatment Center to see Michael Bishara, M.D. (AR 290). He reported stopping polysubstance abuse two weeks earlier. (Id.). However, Plaintiff was still in withdrawal. (Id.). Plaintiff was detoxing from heroin, methamphetamine and opiates. (Id.). Plaintiff failed to attend his April 19, 2010 appointment, but on April 26, 2010, Plaintiff stated that the medications were helping his mental health. (AR 294).

On May 7, 2010, Plaintiff again failed to attend an appointment with Dr. Bishara. (AR 352). On May 25, 2010, Plaintiff alleged body aches and sweats. (Id.). On June 10, 2010, Plaintiff relapsed, allegedly due to stress. (AR 351). Plaintiff finished his rehabilitation program, having been sober for thirty days, on July 7, 2010. (AR 350).

Plaintiff began visiting Beatrice Brody, M.D., for mental treatment on July 27. (AR 362). Plaintiff alleged that his drinking had increased as he began having business problems. (Id.). Plaintiff reported that he had moved out of his family's home and became involved with people who used drugs, which is allegedly when he began using. (Id.). Later that month, Plaintiff met with Dr. Brody and alleged that he felt "pressured" at home. (AR 361). Plaintiff also stated that he was playing and interacting with his younger children, but maintained that he was uncomfortable around people. (Id.). Plaintiff alleged that he could not drive and stated he spent all day watching TV and playing video games. (Id.). In September 2010, Plaintiff again reported to Dr. Brody. (AR 360). Plaintiff continued to allege that he felt

uncomfortable going outside and that wearing a cap made him feel secure. (Id.).

In October 2010, Plaintiff reported that he was able to go to his son's football game, but the voices bothered him. (AR 359). Plaintiff also reported going to the store with his father, although he went midday to avoid crowds. (Id.). In November 2010, Plaintiff told Dr. Brody that he had to install a Breathalyzer in his truck because of a court order. (AR 358). Plaintiff was also ordered to enter a class to control alcoholism because of a DUI in 2009. (Id.). Plaintiff alleged anxiety. (Id.). In December of 2011, Plaintiff again stated that he felt uncomfortable around others and trapped at home. (AR 357). He also stated that he did not speak at his Narcotics Anonymous meetings unless "prodded." (Id.).

From October 6, 2010 to November 19, 2010, Plaintiff also saw psychiatrist Michael Towlin, M.D. (AR 344-349). Dr. Towlin diagnosed Plaintiff as schizoaffective. (AR 347). Plaintiff told Dr. Towlin that he had not drank alcohol "for years." (AR 346). Dr. Towlin prescribed medication, supportive therapy, and encouraged Plaintiff to exercise. (AR 348). Plaintiff was described as anxious, nervous and "psychologically unstable." (Id.).

**B.   Examining Physician's Opinion**

On May 9, 2009, at the request of the Agency, Plaintiff saw Hiruy Gessesse, M.D. for a complete psychiatric evaluation. (AR 308-312). Plaintiff told Dr. Gessesse that his psychotic symptoms were possibly

7

due to his addiction to painkillers.  (AR 309).  Plaintiff stated that he had previously abused painkillers, alcohol and marijuana, but he also stated that he was sixty days clean at the time and acknowledged that he was in a rehabilitation program.  (Id.).  Plaintiff said that he was no longer hearing voices and stated that his medications were "really helping."  (Id.).

Dr. Gessesse found that Plaintiff was cooperative, maintained good eye contact and was "able to establish rapport with the examiner."  (AR 310).  Plaintiff's thought processes were "concrete", "linear" and "goal directed."  (Id.).  Plaintiff also "exhibited no evidence of auditory or visual hallucinations, delusions or illusions."  (Id.).  Dr. Gessesse diagnosed Plaintiff with substance induced psychosis and polysubstance dependance.  (AR 311).  Dr. Gessesse also found that Plaintiff could "maintain regular attendance and perform work consistently" and "complete a normal workday and workweek."  (Id.).  Further, because Plaintiff could accept instruction during the evaluation, Dr. Gessesse found that he could accept instruction from a supervisor.  (Id.).  Similarly, Dr. Gessesse found that because Plaintiff could interact adequately throughout the evaluation, he could interact adequately with coworkers and the public.  (Id.).

C.   **Reviewing Physician's Opinion**

On May 18, 2010, State Agency Psychiatrist C. Dudley, M.D. reviewed Plaintiff's mental evidence.  (AR 315).  Dr. Dudley found that "although [Plaintiff] has some mental difficulties, they do not prevent him from performing all types of work activities."  (AR 325).  Dr. Dudley

determined that Plaintiff had the impairment of polysubstance dependence. (AR 321). Dr. Dudley also found that Plaintiff could "understand, remember, and carry out simple work-related tasks" and had "significant limitations in the ability to . . . relate to others, or otherwise adapt to the requirements of the normal workplace." (AR 328).

State agency consultant S. Choo reviewed Plaintiff's physical history on May 18, 2010. (AR 334). S. Choo found that although Plaintiff experienced some limitations from his ankle impairment, "they [did] not prevent him from performing all types of work activities." (AR 333).

**D.** **Plaintiff's Testimony**

In his application for DIB, Plaintiff alleged disability due to mental illness and Achilles tendon injury. (AR 177). Plaintiff alleged that he was "hearing voices" and "losing touch with reality" and that he could not walk without extreme pain. (Id.). Furthermore, medication did not help him and that he could no longer function with his family. (Id.).

In Plaintiff's function report, Plaintiff alleged that on "good days" he could look for work and run errands, but that he still needed time to be alone. (AR 205). On "bad days" he could not get out of bed, would be "frozen in [his] room," or would "drive all day and night" and felt angry and depressed. (Id.). Plaintiff worked with computers and electronics daily and would regularly do so with friends. (AR 209).

9

Plaintiff also reported that walking was painful and that in order to walk, he had to take short breaks.  (AR 210).

At his hearing in front of the ALJ, Plaintiff testified that he became unable to work mainly because of his mental health issues.  (AR 73).  According to Plaintiff, his mental condition predated his substance abuse problems.  (AR 74).  Plaintiff alleged that he first became addicted to painkillers following a snowboarding accident.  (AR 69).  Plaintiff stated that he had never did mushrooms, but had used heroin.  (Id.).  Plaintiff further testified that he completed rehabilitation for substance abuse and that he had not used illegal drugs or alcohol for over a year.  (AR 69-70).  In regard to Plaintiff's symptoms, Plaintiff testified that he had daily panic attacks, could not leave the house because of agoraphobia and could not be around crowds or loud things.  (Id.).  At the time, Plaintiff said his medication kept him "even keel to a point."  (AR 83).

Plaintiff testified that he could drive and attended his son's football games once a month.  (AR 76-77).  Plaintiff also rode his bicycle to the beach for exercise, but spent most days "moping around the house," doing some cleaning and playing videogames.  (AR 81-82).  Finally, Plaintiff did some construction-related work for his father, such as planning and bidding, in 2008.  (AR 68, 75).

**E.   Vocational Expert Testimony**

Vocational Expert ("VE") Gail Maron testified at Plaintiff's hearing.  (AR 84).  The ALJ asked the VE to consider a person who was

Plaintiff's age, with a high school education and the same past work experience as Plaintiff, limited to light exertion and nonexertionally limited work that involves simple, repetitive tasks for psychiatric reasons, no public contact, and no more than occasional peer contact. (AR 87). The VE testified that with those limitations, a individual would not be able to perform Plaintiff's past work. (Id.). However, the VE also stated testified that other work was available nationally to a person with such limitations, including housekeeper, semi-automatic machine operator, table worker, and inspector. (AR 88).

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. See 20 C.F.R. §§ 404.1510, 416.910.

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id.

12

at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity[2] ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded, at step one, that Plaintiff had not engaged in substantial gainful employment since September 1, 2007. (AR 22).  At step two, the ALJ found that Plaintiff had the severe impairments of panic disorder, status post left Achilles tendon repair and a history of polysubstance abuse.  (Id.).  At step three, the ALJ found that Plaintiff did not have

---

[2]  Residual functional capacity is "the most [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 27).

The ALJ then found that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) "except he is limited to simple, repetitive tasks; he is limited to jobs with no public contact; and he is limited to occasional interaction with peers." (AR 25). Based on the VE's testimony, the ALJ found that Plaintiff was unable to perform any past relevant work. (AR 37). However, at step five, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy. (AR 38). Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 39).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater,

112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff contends that the ALJ erred for three reasons.  First, Plaintiff alleges that the ALJ failed to properly assess his subjective complaints and credibility.  (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 6).  Second, Plaintiff argues that the ALJ failed to properly consider all of the relevant medical evidence.  (Id. at 2-3).  Specifically, Plaintiff maintains that the ALJ erred in failing to discuss Dr. Brisken's treatment records from August 2011 to December 2011.  (Id. at 3).  Third, Plaintiff contends that the ALJ failed to find Plaintiff had the severe mental impairments of dissociative disorder, paranoid state, psychosis and schizoaffective disorder, and therefore erred at step two of the Five-Step evaluation process.  (Id. at 5).  However, the Court disagrees in regard to all three claims.  For

the reasons discussed below, the Court finds that the ALJ's decision must be AFFIRMED.

## A.   The ALJ Cited Clear And Convincing Reasons For Finding Plaintiff's Subjective Testimony Less Than Fully Credible

Plaintiff contends that the ALJ erred in his evaluation of Plaintiff's credibility by failing to cite clear and convincing reasons for finding Plaintiff less than fully credible. (MSPC at 6). Further, Plaintiff argues that his statements regarding his limitations are consistent with the complete record. (Id.). However, the Court disagrees. The ALJ properly cited clear and convincing reasons for rejecting Plaintiff's testimony.

When assessing the credibility of a claimant, the ALJ must engage in a two step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.). Then, if there is, in order to reject the testimony, the ALJ must make specific credibility findings. (Id.). In assessing the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." Turner, 613 F.3d at 1224 (internal quotations omitted). The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately or unexplained failure to pursue treatment or follow treatment. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). Additionally, the ALJ may discredit the claimant's testimony where his normal activities can transfer to the

16

work setting.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

Here, there was medical evidence of an underlying impairment. However, the ALJ gave specific, clear and convincing reasons to reject Plaintiff's testimony about the severity of his symptoms.  The ALJ reviewed the record and cited to numerous inconsistences in Plaintiff's testimony and the record regarding Plaintiff's substance abuse and his physical and mental impairments.  (AR 31-36).

Regarding Plaintiff's substance abuse, the ALJ noted that at the hearing, Plaintiff testified that he had a bad foot and took pain medications, but denied the use of illegal substances or alcohol in over a year and "expressly denied any substance abuse in 2010." (AR 31, 70). However, later in the hearing, Plaintiff testified that he had a history of substance abuse and that "six to seven months" prior, he "may have had a beer." (AR 31, 81).  The ALJ further pointed out that Plaintiff testified that he was in rehabilitation for pain medication addiction, yet the medical records included references to the "ongoing use of substances, including methamphetamine, cocaine, heroin, mushrooms and alcohol." (AR 31, 285-302).  The ALJ also noted that in October 2010, Plaintiff told Dr. Brody that he had been drinking and was entered into a court-ordered class for treatment of his alcoholism and had a Breathalyzer installed in his truck.  (AR 33, 358).

Additionally, the ALJ noted that Plaintiff continually minimized his substance abuse problems when speaking with his treating physicians and examiners, including the ALJ himself. (AR 33).  Specifically, when

starting treatment with Dr. Tolwin in 2010, Plaintiff "failed to mention his history of polysubstance abuse." (AR 33, 336-349). The ALJ noted that "this repeated failure to provide candid information about his polysubstance abuse history significantly and adversely affects [Plaintiff's] credibility." (AR 33).

The ALJ also cited clear and convincing reasons for rejecting Plaintiff's testimony regarding his physical limitations and his inability to work. (AR 33). Plaintiff testified that he could not work, yet also testified that he "helped" his father with construction projects. Plaintiff explicitly maintained the help he did for his father was not "work". (AR 33, 68). However, the ALJ noted that he reported to his treating psychiatrist in December 2008, that he was "working" for his father and that he "had a job". (AR 33, 281). Plaintiff also told Dr. Brody that he could no longer drive. (AR 361). However, the ALJ noted that Plaintiff's wife and other reports show that he was driving, including Plaintiff's testimony that he would sometimes drive "all day and night." (AR 34, 205). Similarly, in Plaintiff's function report to the State Agency, he stated that he did not do any chores, only his wife did. (AR 34, 207). Again the ALJ pointed to reports from Dr. Brody that showed Plaintiff was "doing laundry, picking up around the house, and doing dishes." (AR 34, 358). The ALJ also noted that Plaintiff was "fixing things around the house, running errands with his father, cleaning up the children's toys and cleaning up the kitchen after dinner." (AR 34, 356). Further, Plaintiff told health care providers that he could not work because of his foot pain. (AR 32, 337). However, Plaintiff testified at the hearing and told treating doctors that he was riding his bike for exercise and going to

the gym, undermining his claim that his foot pain prevented normal movement. (AR 33, 354-55).

The ALJ also noted inconsistencies in Plaintiff's testimony regarding mental limitations. (AR 35). Plaintiff testified that he could not work because his agoraphobia prevented him from showing up to a job consistently. (AR 73). However, the ALJ noted that Plaintiff was able to attend his son's football games, run errands, go to the gym, go on drives, and go for bike rides to the beach. (AR 35, 359) Although Plaintiff repeatedly alleged not being able to leave the house, the ALJ found that much of Plaintiff's activities took him to public places. Further, the ALJ noted that no psychiatrist had ever diagnosed Plaintiff with agoraphobia. (AR 35). The ALJ also noted that, Plaintiff told a consulting psychiatrist that his auditory hallucinations were secondary to his pain medication addiction. (Id.). However, at the hearing, Plaintiff alleged that his mental health problems predated his substance abuse. (AR 74). Despite this conflicting testimony, the ALJ observed that Plaintiff made "no offer of proof to explain why [Plaintiff] would misrepresent his mental health condition to his treating source providers." (AR 35).

Further, Plaintiff argues that the ALJ could not make a complete credibility finding without considering treating records from Dr. Briskin that show a second foot surgery and additional limitations. (Plaintiff's Reply ("Pl's Reply") at 6). However, the failure to discuss these records is harmless error. "An ALJ's error is harmless when it is inconsequential to the ultimate nondisability determination." Molina, 674 F.3d at 1115 (internal citations and quotations omitted).

Here, the ALJ cited many inconsistencies in the record, regarding both Plaintiff's physical and mental limitations.  Although the ALJ may have erred in stating that there was no medical evidence of a second surgery, the severity of the pain that Plaintiff alleged is still undermined by Plaintiff's active lifestyle and his reports of pain improvement to other treating doctors.  (AR 346, 354-55).  Although the reports from Dr. Briskin evidence an underlying impairment, the ALJ would have still found Plaintiff less than fully credible because the record simply does not support the severity of pain alleged.

The Court finds that the discrepancies between the record and Plaintiff's testimony constitutes a clear and convincing reason to discount Plaintiff's testimony.  Accordingly, the ALJ provided clear and convincing reasons for finding Plaintiff less than fully credible.

**B.    The ALJ Properly Considered The Relevant Medical Evidence**

Plaintiff contends that the ALJ erred in failing to properly consider all of the relevant medical evidence.  Specifically, Plaintiff argues that the ALJ erred by failing to discuss Dr. Briskin's treatment records, as well as physical therapy records, from August 2010 to December 2010.  Plaintiff states that these records are significant and probative evidence of Plaintiff's left foot condition and the resulting limitations.   The Court disagrees.

Social Security regulations require the ALJ to consider all the relevant medical evidence when determining whether a claimant is disabled.  20 C.F.R. §§ 404.1520(b), 416.927(c).  Medical reports from

licensed medical physicians are one acceptable source of evidence. 20 C.F.R. § 1513(a),(b).  When considering medical reports, the ALJ must give the greatest weight to the opinion of the claimant's treating physicians.  Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1222 (9th Cir. 2010).  If an ALJ rejects or ignores a treating physician's opinion, the ALJ must give specific reasons for doing so.  Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1234 (9th Cir. 2011). Further, while the ALJ is required to develop and interpret the medical record, the ALJ is not required to discuss every piece of evidence. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003).

Here, the ALJ considered all of the relevant medical evidence and it is consistent with his non-disability determination.  The ALJ discussed Plaintiff's left foot problems in his decision in detail.  The ALJ noted Plaintiff's first surgery in 2006 and discussed Plaintiff's visit to the doctor in 2007.  (AR 22, 26, 251).  The ALJ discussed Plaintiff's X-Ray from 2008 showing the Achilles tendon spur and a metallic object leftover from the previous surgery.  (AR 23, 257-58). The ALJ also made note of the July 2010 report from UCLA, where Plaintiff reported that he was "ok pain-wise." (AR 32).  The ALJ also discussed Plaintiff's August 2010 complaints that he could only stand ten-fifteen minutes and had pain in his heel and big toe.  (AR 24, 305).

The ALJ further noted that Plaintiff alleged undergoing a second surgery in late 2010 and that the he reported that it improved his pain condition.  (AR 25, 32, 346).  The ALJ also noted that Plaintiff was doing physical therapy for his foot in October of 2010.  (AR 25, 358). Furthermore, the ALJ saw from psychiatric records that by February of

1   2011 Plaintiff was again riding his bike for exercise and that by March

2   of 2011 Plaintiff was only taking over-the-counter medication for pain.

3   (AR 26).  This suggests that Plaintiff's surgery and physical therapy

4   were effective and although Plaintiff alleged disabling foot pain, he

5   was not living a sedentary lifestyle.

6

7       Plaintiff further argues that the ALJ erred by stating that there

8   was no objective evidence of a second surgery or a changed foot

9   condition that would lead to Plaintiff's complaints of pain, yet this

10  evidence was provided in exhibit 18f (AR 373-84) in Dr. Briskin's

11  report. (MSPC at 3)  However, The ALJ's omission of this evidence is at

12  most harmless error because the additional records not discussed by the

13  ALJ would not affect the ultimate nondisability determination.  Molina,

14  674 F.3d at 1115.

15

16      Plaintiff is correct in stating that the August 2010 to December

17  2010 records from Dr. Briskin show that Plaintiff did have objective

18  evidence of further limitations at that time.  However, this does not

19  change the fact that the ALJ considered other records from the same time

20  period in which Plaintiff says the surgery helped with his pain. (AR

21  346).  Nor does the failure to discuss Dr. Briskin's records change the

22  fact that only months after the surgery Plaintiff reported to other

23  treating doctors that he was doing better and was active again. (AR 354-

24  56).  Therefore, while the ALJ may have failed to discuss this evidence

25  directly, he still recognized that there was another surgery from

26  reading the psychiatric records and also cited evidence showing

27  Plaintiff's improvement.

28

Furthermore, rather than undermine the ALJ's decision, the physical therapy records that were omitted from the ALJ's discussion support the nondisibility determination.  The physical therapy records from August 2010 to December 2010 show that the therapist was hoping for recovery in six to eight weeks, that the surgery results were "excellent," that Plaintiff initially could walk with a boot, but returned to normal footwear, and that although Plaintiff reported having a limited range of motion and disabling pain, aggressive stretching and exercise was prescribed.  (AR 374-77).  The records also show that Dr. Briskin noted Plaintiff's walking had increased significantly since the surgery, which establishes that Plaintiff was better after the surgery than before.  (AR 380).

Further, the records that the ALJ failed to discuss do not show that Plaintiff's left foot impairment meets the C.F.R. requirements for a Listing.  To meet a Listing for a Musculoskeletal impairment, such as Plaintiff's left foot impairment, a claimant must demonstrate an inability to ambulate effectively.  (20 C.F.R. § 404 App. 1).  The inability to ambulate effectively is an "extreme limitation of the ability to walk," meaning that the impairment "interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."  (Id.).  Although the records from Dr. Briskin and the physical therapy reports show that Plaintiff did have a second surgery and was complaining of pain, they do not show that Plaintiff was so limited in his ability to walk that he could not "independently initiate, sustain or complete activities."  Furthermore, records that the ALJ cited from the same time period show that Plaintiff was active on his own.  Therefore, even taking into account the evidence from the

records the ALJ did not discuss, Plaintiff does not meet the Listing criteria.

The ALJ thoroughly considered all of the relevant evidence from the period of alleged disability.  If failing to discuss the August to December 2010 records from Dr. Briskin and physical therapy was error, it was at most harmless error, because those records would not change the ALJ's ultimate nondisability determination.

**C.**   **The ALJ's Step-Two Finding That Plaintiff Had The Severe Mental Impairment Of Panic Disorder, Polysubstance Abuse and Status Post Left Achilles Tendon Repair Is Complete And Supported By Substantial Evidence**

Plaintiff's final contention is that the ALJ erred in failing to find that Plaintiff had the severe mental impairments of dissociative disorder, paranoid state, psychosis, and schizoaffective disorder. (MSPC at 5-6).  Further, Plaintiff argues that the ALJ erred in failing to include limitations from those impairments in Plaintiff's RFC. (Id. at 6).  Plaintiff further maintains that the ALJ specifically failed to consider how these additional mental impairments led to Plaintiff's inability to consistently show up to work.  (Pl's Reply at 4).  For the reasons stated below, the Court finds that the ALJ's step two finding of Plaintiff's mental impairments and his subsequent finding of Plaintiff's limitations are complete and supported by substantial evidence.

At step two of the five-step evaluation process, it is Plaintiff's burden to show that his impairments are severe. Molina, 675 F.3d at 1110. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work. 42 C.F.R.§ 404.1520(c). Where the ALJ finds a severe medically determinable impairment at step two of the sequential analysis, "all medically determinable impairments must be considered in the remaining steps of the sequential analysis." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007). Finally, an ALJ must consider all limitations that are supported by substantial evidence. Osenbrock, 240 F.3d at 1165.

Here, the ALJ thoroughly considered and discussed Plaintiff's medical records regarding his mental health. The records show infrequent visits and varying diagnoses by multiple doctors over five years, as well as a history substance abuse problems. See, eg, (AR 291-282, 344, 347, 364, 365). Although Plaintiff consistently described anxiety and social problems, as discussed above, the ALJ cited specific reasons for finding Plaintiff only partially credible. Therefore, the ALJ was not required to consider all of Plaintiff's subjective complaints regarding his limitations, such as the alleged complete inability to leave the house. Considering the record as a whole, the ALJ's findings of impairments of Panic Disorder and polysubstance abuse are supported by substantial evidence. Accordingly, the ALJ properly concluded that Plaintiff had three non-exertional limitations: Plaintiff must perform simple, repetitive tasks, may have no public contact, and may only have occasional peer interaction. (AR 28). These limitations are entirely consistent with Plaintiff's symptoms and they are supported by substantial evidence. Plaintiff has not demonstrated that if the

ALJ found the additional severe impairments of dissociative disorder, paranoid state, psychosis, and schizoaffective disorder, the ALJ would have found additional non-exertional limitations.  Plaintiff also fails to show that these additional mental impairments were consistently found by medical providers.

As noted above, Plaintiff does not cite to any additional limitations that would result from the additional diagnoses that he claims the ALJ ignored.  Although Plaintiff contends that the ALJ failed to include Plaintiff's alleged inability to show up to work regularly as a limitation, the ALJ explicitly addressed this issue in his decision. (Pl's Reply at 5).  Indeed, the ALJ gave clear and convincing reasons for rejecting Plaintiff's testimony regarding his ability to maintain a regular work schedule because of his fear of leaving the house. (AR 35).  The ALJ noted that despite Plaintiff's statements that he was afraid to leave the house, Plaintiff "[attended] his son's football games, [ran] errands with his father, [went] to a gym to work out, [went] for drives, [went] on long bike rides down to the beach, and other activities that took him out of the house."  (AR 35). Accordingly, the ALJ properly disregarded this additional limitation.

\\

\\

\\

\\

\\

\\

\\

Finally, even if it was an error for the ALJ to not cite the other diagnoses as impairments, which it was not, it was harmless error, because all of Plaintiff's limitations were included in the RFC. Accordingly, any additional diagnosis not cited as a severe impairment would not change the ultimate nondisability determination. Therefore the ALJ did not err in his step two finding, as he made a complete finding of Plaintiff's severe impairments, and the ALJ included all the limitations supported by substantial evidence in Plaintiff's RFC.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 14, 2013

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER ONLINE DATABASE.

27